**In re Brian K. GILSINN, Debtor.**

**MAGNA BANK, N.A., Successor to Magna Bank of Missouri, Movant,**

v.

**Brian K. GILSINN, Debtor, Diversified Maintenance Corp., Co–Debtor, John V. LaBarge, Jr., Trustee, Respondents.**

**Bankruptcy No. 97–44625–293.**

United States Bankruptcy Court, E.D. Missouri, Eastern Division.

Nov. 20, 1997.

---

Steven C. Bain, St. Louis, MO, for Debtor.

Deborah J. Volmert, Belleville, IL, for Magna Bank, N.A.

John V. La Barge, St. Louis, MO, Chapter 13 Trustee.

### MEMORANDUM OPINION

DAVID P. McDONALD, Bankruptcy Judge.

### JURISDICTION

This Court has jurisdiction over the parties and subject matter of this proceeding pursuant to 28 U.S.C. §§ 1334, 151, 157 and Local Rule 29 of the United States District Court for the Eastern District of Missouri. This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(L), which the Court may hear and determine.

### PROCEDURAL BACKGROUND

1. On May 13, 1997, Brian K. Gilsinn and his wife, Kathryn E. Gilsinn, filed a petition seeking to relief under Chapter 13 of the Bankruptcy Code (11 U.S.C. §§ 101–1330) and a Chapter 13 plan.

2. Among their personal property, Debtors listed interests in three vehicles; a 1994 Dodge Shadow, a 1990 Mercury Cougar and a 1988 Chevrolet Blazer. Debtors did not list an interest in a 1994 Chevrolet Cavalier Convertible on their schedules.

3. Among the unsecured debts on Debtors' schedules is listed a $19,000.00 obligation to Magna described as "5/95, car loan deficiency after repossession."

4. Magna Bank, N.A. (Magna), filed an objection to Debtors' plan. In its Objection Magna alleged that Debtor Brian Gilsinn and Diversified Maintenance Corp. (Diversified) owe it $16,262.46. Magna further alleges that the debt Gilsinn and Diversified owe it is secured by a perfected security interest in a 1994 Chevrolet Cavalier Convertible titled to "Diversified Maintenance Corp (sic) Gilsinn B." Magna also states in its Objection that two individuals have advised it that Debtor possesses the 1994 Cavalier. Magna offers two grounds for its Objection. First, Magna maintains Debtor filed his plan in bad faith because he did not list Magna's claim among his secured claims and he failed to list an interest in the 1994 Cavalier among his personal property. Second, Magna asserts that because Debtors listed interest in three vehicles other that the 1994 Cavalier, two of the four vehicles are luxuries not necessary to Debtors' reorganization. Magna asked the Court to deny confirmation of Debtors' plan or, in the alternative, to require Brian Gilsinn to locate the 1994 Cavalier and deliver it to Magna.

5. Magna also moved the Court for relief from the automatic stay so that it might locate and liquidate the 1994 Cavalier.

6. The Court held a hearing on Magna's Objection and Motion for Relief on July 31, 1997. At the hearing's conclusion, the Court granted Magna's Motion for Relief so that it might locate and foreclose on the 1994 Cavalier. The Court took under advisement Magna's Objection to Confirmation.

### FACTUAL BACKGROUND

Brian Gilsinn (Debtor or Gilsinn) was the only witness to testify at the July 31 hearing. From his testimony and the record as a whole, the Court makes the following factual findings:

1. Gilsinn and two friends, David Reker and Kristin Reker, were joint venturers in and the only shareholders of Diversified.

2. Gilsinn served as Diversified's president and the Rekers were corporate officers. As Diversified's president, Gilsinn was empowered to enter into contracts on the corporation's behalf; Gilsinn estimated he employed this power on approximately twenty occasions. Of the twenty contracts he entered, five were for the purchase of vehicles to be used in Diversified's operations.

3. In August of 1994, Gilsinn purchased a 1994 Chevrolet Cavalier for Diversified.

4. To purchase the 1994 Cavalier, Gilsinn executed a Retail Installment Contract and Security Agreement which he signed both in his individual capacity and as Diversified's president. Upon their execution, the contract and security agreement were assigned to Magna.

5. Gilsinn admitted that his name, "Gilsinn B" appears on the 1994 Cavalier's title but explained that he thought the car was titled that way because, to his understanding, he had been required to guarantee Diversified's obligation.

6. Gilsinn testified that the sales agreements and titles for all the vehicles he purchased as president of Diversified were structured like those for the 1994 Cavalier.

7. The 1994 Cavalier was used by Diversified's sales force to make sales calls. Diversified maintained the vehicle and, Debtor believes, procured insurance for it.

8. Debtor did not possess keys to the 1994 Cavalier. He rode in the car only once and could not drive it because it was not modified to accommodate his physical condition. Mr. Gilsinn appeared in court seated in a wheel chair. He cannot now nor could he ever drive the 1994 Cavalier.

9. From August 1994 through November 1995, Diversified used and paid for the 1994 Cavalier.

10. During 1995, relations between Debtor and the Rekers deteriorated and in November 1995 Debtor left Diversified's employment. When he left Diversified, Gilsinn left the 1994 Cavalier with Diversified.

11. In January 1996, Gilsinn began receiving late payment notices indicating that Diversified was not making payments on the 1994 Cavalier. After receiving the notices, Debtor called Magna and, knowing that Diversified had dissolved by January 1996, drove past the residences of the Rekers and Curtis Schmidt, a former Diversified employee, looking for the 1994 Cavalier.

12. Between February 1996 and January or February of 1997, Gilsinn spoke with many recovery companies about the 1994 Cavalier.

13. Gilsinn did not report the car stolen because he believed that doing so could expose him to liability should the party possessing the car be entitled to do so.[1] Because the car was titled to Diversified as well as to him, Gilsinn believed someone could be in rightful possession of the vehicle without his knowledge.[2]

14. Schmidt and the Rekers told Magna that Gilsinn either had the 1994 Cavalier or had given it to his daughter to take to California.

15. To date the 1994 Cavalier has not been located.

### DISCUSSION

Two other bankruptcy courts have confronted facts similar to those in the case at bar and the Court finds their insights to be instructive and applicable to Gilsinn's case. *See In re Gabor*, 155 B.R. 391 (Bankr. W.D.W.Va.1993); *In re Elliott*, 64 B.R. 429 (Bankr.W.D.Mo.1986). In *In re Gabor*, the debtor's wife left him and took the couple's automobile with her. 155 B.R. at 392. To purchase the vehicle, Gabor and his wife had cosigned on a loan from General Motors Acceptance Corporation (GMAC). GMAC filed a proof of claim for a secured claim against Gabor's bankruptcy estate. *Id.* Gabor objected to GMAC's claim. *Id.* The Bankruptcy Court for the Western District of West Virginia concluded that under Washington law,[3] GMAC's security interest in the car survived but that it could not have a secured claim in Gabor's bankruptcy because its collateral was missing. *Id.* at 393. The court pointed out that, even if GMAC had a secured claim in Gabor's bankruptcy the value of the secured portion of that claim, under section 506 of the Code, was zero.

---

1. At the July 31 hearing on this matter, Gilsinn indicated that he would report the 1994 Cavalier as stolen so that an insurance claim could be filed for Magna's ultimate benefit.

2. Debtor is not an attorney and testified that police officers told him of the possible consequences of reporting the car stolen. By January 1996, Diversified had ceased operating.

3. The *Gabor* court determined that because the debtor and his wife had made their contract in Washington that state's law governed the contract. 155 B.R. at 393.

The *Gabor* court drew heavily from the reasoning expressed in *In re Elliott*. *In re Elliott* involved a debtor who, with her former fiance, purchased an engagement ring set on credit from Hurst. 64 B.R. at 430. Hurst perfected its security interest. *Id.* Elliott's fiance "disappeared" and took the ring set with him. *Id.* When Elliott filed bankruptcy, Hurst contended it had a secured claim against Elliott's estate and that the value of that claim was equal to the value of the fair market value of the engagement ring set. *Id.* The *Elliott* court disagreed. *Id.* at 430–31. Regarding Hurst's first contention, that it held a secured claim, the court found that under Kansas law,[4] Hurst's security interest continued in the ring set despite the fact that Elliott had involuntarily disposed of it. *Id.* at 430. The court distinguished between Hurst's having a security interest in the ring set and Hurst having a secured claim in Elliott's bankruptcy. *Id.* The *Elliott* court reasoned that "[b]y definition, 'secured claim' [as used in bankruptcy] requires availability of collateral to secure the creditor's right to payment" and because the ring set was missing Hurst could not have a secured claim based upon it in Elliott's bankruptcy. *Id.*

Alternatively, the *Elliott* court held that, even if it had allowed Hurst's secured claim that claim would have been valued at zero under section 506(a) of the Code. *Id.* The court equated the missing rings to property that had been destroyed or stolen. *Id.* at 431. Finding that Hurst's secured claim was dependant upon the value of the estate's interest in the rings and having concluded that the estate's interest in destroyed or stolen property would have no value, the *Elliott* court determined that Hurst's interest in the ring set was of no value. *Id.*

■ The version of the Uniform Commercial Code (UCC) provision governing a secured party's rights upon disposition of its collateral in effect in Missouri uses language very much like that in the Kansas and Washington statutes applied respectively in *In re Elliott* and *In re Gabor*. *Compare* Mo.Rev. Stat. § 400.9–306(2) (1994) *with* K.S.A. 84–9–306(2) *and* Wash. Rev.Code Ann. § 62A.9–306(2) (West 1993). The parties did not cite and the Court has not found any cases holding that the current version of UCC section 306(2) in effect in Missouri should be applied any differently than the versions in effect in Kansas and Washington. Missouri's version provides that "a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party ..." and does not require that the disposition have been made voluntarily by the debtor. *See* Mo.Rev.Stat. § 400.9–306(2)(c) (1994). Hence, the Court, like the *Gabor* and *Elliott* courts, concludes that Magna continues to have a security interest in the missing automobile.

■ However, the Court also agrees with the conclusion of the *Elliott* and *Gabor* courts that a party holding a security interest in property which the debtor cannot produce is not a secured creditor in the debtor's bankruptcy. Here, the Court is convinced that Gilsinn does not have the 1994 Cavalier. The Court is also convinced that Debtor utilized his best efforts to locate the car; he looked for it himself and he assisted the asset relocation companies in their attempts to locate the car. Because the car cannot be produced, Magna may not be treated as a secured creditor in Gilsinn's bankruptcy. As the *Elliott* court noted, "[a] claim paid the amount it would receive if secured, but without access to the underlying collateral, [is] simply ... an unsecured claim paid on a priority basis outside the statutory priority scheme." 64 B.R. at 430. Finally, the Court distinguishes this case from those where debtors have hidden estate assets, been less than forthright with the court or failed to offer their best efforts to locate missing collateral.

---

4. The *Elliott* court applied Kansas law because     the parties made their contract in Kansas.